**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

**January 20, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

YOLANDA LUCAS, as the Special
Administrator of the Estate of Michelle
Ann Caddell, deceased,

     Plaintiff - Appellant,

v.

TURN KEY HEALTH CLINICS, LLC, a
domestic limited liability corporation; VIC
REGALADO, individually and in his
official capacity as Tulsa County Sheriff;
GARY MYERS, MD,

     Defendants - Appellees,

and

SHIRLEY HADDEN,

     Defendant.

No. 22-5002

———————————————————

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:20-CV-00601-TCK-CDL)**
———————————————————

Lawrence R. Murphy, Jr. (Donald E. Smolen, II, Laura L. Hamilton, Dustin J.
Vanderhoof, and John Warren, on the briefs), Tulsa, Oklahoma, for Plaintiff - Appellant.

Jo Lynn Jeter (Joel L. Wohlgemuth and W. Caleb Jones of Norman, Wohlgemuth, L.L.P.,
with her on the brief), Tulsa, Oklahoma, for Defendants - Appellees.
———————————————————

Before **TYMKOVICH**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

This case concerns the tragic death of Michelle Ann Caddell and the treatment, or lack thereof, she received for her cervical cancer as a pretrial detainee in the Tulsa County Jail.  Yolanda Lucas, as special administrator of decedent Ms. Caddell's estate, initiated the case under 42 U.S.C. § 1983 bringing claims of deliberate indifference in violation of the Eighth and Fourteenth Amendments against Dr. Gary Myers and against Turn Key Health Clinics, LLC ("Turn Key") and Sheriff Vic Regalado in his official capacity through municipal liability, violations of the Equal Protection clause against Turn Key and Sheriff Regalado, and negligence and wrongful death under Oklahoma state law against Dr. Myers and Turn Key.  I Aplt. App. 31–35.

The three Defendants individually moved to dismiss all claims and the district court granted the motions.  Lucas v. Turn Key Health Clinics, LLC, 2021 WL 5828367 (N.D. Okla. Dec. 8, 2021).  Dr. Myers is a medical doctor employed by Turn Key and responsible for Ms. Caddell's treatment.  I Aplt. App. 13.  Turn Key is a private correctional health care company that contracts with Tulsa County to provide medical staff and care in county jails.  Id. 11–12.  Sheriff Regalado is the Tulsa County Sheriff and sued only in his official capacity in an effort to hold Tulsa County and the Tulsa County Sheriff's Office liable.  Id. 12.

Now on appeal, Plaintiff challenges the district court's determinations that she

failed to plausibly allege (1) deliberate indifference to serious medical needs against Dr. Myers; (2) municipal liability against Turn Key and Sheriff Regalado; and (3) violation of the Equal Protection clause against Turn Key and Sheriff Regalado. She also challenges the finding that Dr. Myers and Turn Key are entitled to immunity for the state law claims under the Oklahoma Governmental Tort Claims Act ("OGTCA").[1] Our jurisdiction arises under 28 U.S.C. § 1291 and for the reasons discussed below, we affirm in part, and reverse in part.

## Background

### A.  Factual Background

As alleged in the complaint, Ms. Caddell was arrested and booked in Tulsa County Jail on December 27, 2018, in the custody of the Tulsa County Sheriff's Office. I Aplt. App. 11, 14. She tested positive for chlamydia on January 23, 2019, and made her first complaint of vaginal discharge to jail medical staff on June 22, 2019. Id. 15. She submitted multiple requests on July 5, 6, and 7, for treatment related to hip and thigh pain and was evaluated on July 14 by Nurse Sellu, who noted the pain had begun four weeks earlier. Id. After reporting that she felt a blood clot on August 3, 2019, Ms. Caddell was evaluated by Dr. Myers on August 5 for hip pain and heavy menstrual bleeding. Id. Dr. Myers ordered blood work and noted Ms. Caddell had mild anemia but was otherwise healthy. Id. Ms. Caddell complained again of vaginal discharge on August 10 and Nurse Chumley ordered a culture of the

---

[1] The district court did not expressly find that Turn Key was entitled to immunity. The district court only stated that Dr. Myers was. II Aplt. App. 377.

discharge.  Id. 16.

The blood work results four days later (August 14) revealed Ms. Caddell had mild leukocytosis — elevated white blood cell count (indicating sickness) — which Dr. Myers determined was normal and did not require follow up.  Id.  On August 15, the results of the culture came back and showed heavy E. Coli growth, associated with several virulence factors that contribute to disease.  Id.  In response to the buildup of all these symptoms, Ms. Caddell was only given Tylenol.  Id. 17.

Ms. Caddell again complained to sick call of excessive vaginal bleeding on August 16.  Id.  Dr. Myers noted that on August 20, Ms. Caddell's complaints had resolved.  Id.  Yet, Ms. Caddell once again complained on August 24 to nursing staff of vaginal discharge as well as pain and difficulty with bowel movements.  Further, on August 26, after not having seen a doctor in response to her August 24 request, made a follow-up request in which she apologized for her frequent sick calls but stated "there is something wrong with me and I hurt bad."  Id.  Dr. Myers saw Ms. Caddell on August 27 and wrote in his notes that Ms. Caddell's frequent sick calls "do not fulfill medical logic."  Id.  On September 3, Dr. Myers refused Ms. Caddell's request for more ibuprofen for her pain and determined that she was "abusing the [sick call] system."  Id. (alteration in original).

On September 15, Ms. Caddell saw Nurse Suzanne who noted that Ms. Caddell's symptoms of blood clots and painful excessive vaginal bleeding began **10** months prior.  Id. 18.  Recognizing the severity of these symptoms, Nurse Suzanne placed a referral to an obstetrician.  Id.  On September 20, Ms. Hadden, Turn Key's

4

administrator at the jail, denied the referral until Ms. Caddell's complaints of heavy bleeding for months could be verified. Id. 13, 18. Ms. Caddell received a complete blood count test on September 23 showing that she was experiencing abnormal uterine bleeding and had a sharp drop in hemoglobin levels within the prior six weeks. Id. 18. Ms. Caddell finally saw an obstetrician on September 27, Dr. Hameed, who opined that she had invasive cervical cancer and ordered a pap smear to confirm. Id. Ms. Caddell was seen by jail medical staff on October 3 for pain levels reaching 10/10 before the results of her pap smear on October 6 showed atypical squamous cells. Id. 19.

A follow-up pap smear was ordered, but never performed. Id. Ms. Caddell did not receive treatment or see a doctor from October 6 until October 30. Id. On October 30, she was soaking through a pad from heavy bleeding every 20 minutes and began discharging tissue from her vagina. Id. Because no OBGYN would be at the jail until November 10, jail medical staff transferred her to Hillcrest Hospital. Id. There, Hillcrest physicians determined she had at least stage three cervical cancer and administered morphine for Ms. Caddell's extreme pain. Id. On November 5, Dr. Myers, Turn Key, and/or Sheriff Regalado released Ms. Caddell from custody to deal with her cancer. Id. On November 9, Hillcrest also determined that Ms. Caddell had deep vein thrombosis (DVT) in her left leg. Id. 20. Ms. Caddell began receiving cancer treatment and passed on August 16, 2020. Id.

## B. Procedural Background

In her complaint, Plaintiff brought claims of deliberate indifference under the

5

Eighth and Fourteenth Amendments against Dr. Myers and against Turn Key and

Sheriff Regalado through municipal liability.  I Aplt. App. 31–34.  Plaintiff also

asserted violations of the Equal Protection clause against Turn Key and Sheriff

Regalado.  Id. 34.  Lastly, Plaintiff asserted negligence and wrongful death under

Oklahoma state law against Dr. Myers and Turn Key.  Id. 35.

The district court granted Defendants' motions to dismiss.  First, the court

found that on the deliberate indifference claim against Dr. Myers, the complaint

stated a claim for malpractice rather than a constitutional violation because Dr.

Myers and other Turn Key staff provided "a litany of medical treatment."  II Aplt.

App. 375.  Because there was no underlying constitutional violation by Dr. Myers,

the court found that there could be no municipal or organizational liability for Sheriff

Regalado or Turn Key under Monell.  Id. 377.  As for the Equal Protection claim, the

court held the complaint failed to allege causation between Turn Key and Sheriff

Regalado's policy of not providing feminine hygiene products and Ms. Caddell's

treatment.  Id.  Lastly, the court found that Dr. Myers was immune from liability

under the OGTCA on any state law claims.  Id.

## Discussion

We review de novo the district court's dismissal of a complaint under Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim.  C1.G on behalf of C.G.

v. Siegfried, 38 F.4th 1270, 1276 (10th Cir. 2022).  We accept a complaint's well-

pleaded allegations as true, viewing all reasonable inferences in favor of the

nonmoving party, and liberally construe the pleadings.  Id.  To survive a motion to

6

dismiss, the complaint must allege sufficient facts to state a claim for relief plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## A. Jurisdiction

A district court order must be final to be appealable. 28 U.S.C. § 1291. Here, one named defendant, Defendant Shirley Hadden, was not served in the district court. Ms. Hadden was Turn Key's Health Services Administrator at the jail. She is not a party to the appeal and is listed as a defendant on the district court docket, though not included in the judgment. Under Bristol v. Fibreboard Corp., an unserved defendant "does not prevent" an order from being final and the district court is not required to enter an order dismissing that defendant prior to entering judgment. 789 F.2d 846, 847 (10th Cir. 1986). In Adams v. C3 Pipeline Construction Inc., the court explained that whether the judgment is final depends on the district court order's substance and objective intent. 30 F.4th 943, 958 (10th Cir. 2021). Dismissal of served defendants is not final if the district court makes clear that it expects further proceedings against unserved defendants. Id.

Here, the district court did not enter an order dismissing Ms. Hadden but indicated in its opinion and order that she had never been served. It also removed Ms. Hadden from the caption in its separately issued judgment suggesting that the court did not expect further proceedings against her and substantively intended a final judgment. We have jurisdiction.

## B. Legal Framework for Claims of Deliberate Indifference

Plaintiff challenges the district court's determination that she failed to

7

plausibly allege deliberate indifference against Dr. Myers.  For the reasons discussed below, we agree that she has plausibly alleged deliberate indifference sufficient to defeat a motion to dismiss and reverse the district court on this claim.

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."  Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).  The deliberate indifference standard applies to pretrial detainees, such as Ms. Caddell, through the Fourteenth Amendment.  Paugh v. Uintah Cnty., 47 F.4th 1139, 1153–54 (10th Cir. 2022).   Deliberate indifference contains both an objective and subjective component.  Id. at 1154.

The objective component is satisfied if the deprivation is "sufficiently serious."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  "[M]edical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Sealock, 218 F.3d at 1209 (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)).  Here, Defendants concede that Ms. Caddell satisfies the objective component.  I Aplt. App. 54, 86, 129.

The standard for the subjective component is that the official "knows of and disregards an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837. The official must be aware of the facts from which the inference of a substantial risk of serious harm could be drawn and also draw that inference.  Id.  A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," but rather that the official "merely refused to verify

8

underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Id. at 842, 843 n.8. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" such as whether "the risk was obvious." Id. at 842. An official disregards risk when he fails to take reasonable measures to abate the risk. Quintana v. Santa Fe Cnty. Bd. of Comm'rs, 973 F.3d 1022, 1029 (10th Cir. 2020). For medical professionals, exercising medical judgment and not ordering diagnostic testing such as an X-ray represents at most medical malpractice. Estelle v. Gamble, 429 U.S. 97, 107 (1976). A claim that a course of treatment was inadequate after the exercise of medical judgment, absent an extraordinary degree of neglect, also does not rise to disregard of serious medical need. Self v. Crum, 439 F.3d 1227, 1232, 1234 (10th Cir. 2006).

In Sealock, we stated that the subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ("failure to properly treat theory") or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ("gatekeeper theory"). 218 F.3d at 1211. The latter theory can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another. Id. Even a brief delay in treatment can be unconstitutional. Mata v. Saiz, 427 F.3d 745, 755 (10th Cir. 2005). The district court here erroneously determined the complaint only alleged "the first

9

type of deliberate indifference [failure to treat], i.e., that despite being made aware of Decedent's condition and symptoms, Dr. Myers . . . refused to have her seen by a gynecologist." II Aplt. App. 375.   It appears the district court improperly conflated both theories, and that contrary to the district court's conclusion, the complaint rests on both possible theories for holding Dr. Myers liable.[2]

At issue is whether Plaintiff's complaint satisfies the subjective component of a deliberate indifference claim against Dr. Myers.  The answer to that depends in part on two threshold legal questions that the parties have argued at length: (1) whether the presence of some medical care defeats a deliberate indifference claim, and (2) whether the specific risk Ms. Caddell faced had to be obvious to a lay person to state a claim.

**1. Whether there must be complete denial of care to state a claim of deliberate indifference**

Plaintiff argues that the district court applied a "more stringent subjective standard" for deliberate indifference by requiring her to allege that Ms. Caddell received no medical treatment at all.  Aplt. Br. at 13, 17.  Defendants argue that the district court properly held that a "complete denial of care" is required to state a claim.  See Aplee. Br. at 18–20.  The district court dismissed the claim against Dr. Myers because the complaint allegedly shows she received a "litany of treatment."  II Aplt. App. 375

---

[2] At oral argument, Plaintiff confirmed as much stating that Dr. Myers' deliberate indifference is shown either under a gatekeeper or failure to properly treat theory.

While the Tenth Circuit has rarely directly addressed the failure to treat properly theory, it has conducted a more nuanced approach to determine whether there was a functional denial of care at the time the need for treatment obviously arose.  In fact, Sealock made clear that deliberate indifference may arise from a failure to treat properly, which implies the presence of some degree of treatment at a minimum.  218 F.3d at 1211.  In Oxendine v. Kaplan, the court held that a doctor who ordered daily infirmary visits and was aware of gangrenous black hand tissue for two weeks, yet only prescribed Tylenol with codeine, was deliberately indifferent.  241 F.3d 1272, 1277 & n.7, 1278–79 (10th Cir. 2001).  There, the doctor provided some care but failed to treat the condition properly and delayed referral to a specialist.  Id. at 1277 n.7, 1279.  The patient's medical issue obviously required "additional medical care and referral" and because the doctor delayed addressing that need, he did not commit mere malpractice but rather consciously disregarded substantial risk to the inmate.  Self, 439 F.3d at 1231 (summarizing the holding of Oxendine).  Moreover, in Hunt, we recognized that merely because an inmate has seen several doctors does not "necessarily mean that he received treatment for serious medical needs, i.e. that treatment was prescribed at all or that prescribed treatment was provided."  199 F.3d at 1224; see also Gray v. Geo Grp., Inc., 727 F. App'x 940, 945–46 (10th Cir. 2018) (unpublished) (finding a complaint plausibly alleged subjective deliberate indifference to an inmate's knee injury when after initially providing pain medication, the doctor denied further pain relief, told the patient "to toughen up", and delayed an MRI).

11

As for the gatekeeper theory, this court has found it significant that there was a complete absence of care in determining liability. See Burke v. Regalado, 935 F.3d 960, 992–93 (10th Cir. 2019). In Burke, a nurse failed to act as a gatekeeper when she left an inmate complaining of paralysis in his cell and did not attempt to administer any care. 935 F.3d at 994–95. In contrast, in Crowson v. Washington County State of Utah, the court held that a nurse did fulfill the gatekeeper role when he left a notation in a patient's file for a referral. 983 F.3d 1166, 1180 (10th Cir. 2020). The court in Mata distinguished several nurses under the gatekeeper theory and found that one nurse on duty "completely refused" to fulfill the gatekeeper role when she knew of a patient's unexplained chest pain and told the patient that there was nothing she could do. 427 F.3d at 755–60. However, two other nurses did fulfill their gatekeeper duties by performing an EKG and then reporting the results to a third party respectively, despite providing no other treatment. See id.

Yet, in the gatekeeping context, where some medical care is present, this court has still evaluated it for sufficiency and whether it is the functional equivalent to a complete denial of care. In Estate of Jensen by Jensen v. Clyde, a jail nurse who provided Gatorade instead of referring a patient for serious stomach problems completely failed to fulfill the gatekeeper role. 989 F.3d 848, 860 (10th Cir. 2021). Further, Oxendine, a case which implicated both theories of liability, supports the contention that providing some care does not insulate a medical professional from liability when the professional delays referral to a specialist. 241 F.3d at 1279.

Accordingly, it is possible to have some medical care and still state a claim

12

under the gatekeeper theory.  This makes obvious sense.  The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises.  See Sealock, 218 F.3d at 1211; Mata, 427 F.3d at 751–61.  The nurses in Crowson and Mata did not escape liability simply because they provided a modicum of care, but rather because their actions were sufficient to discharge their gatekeeping obligation.  See Mata, 427 F.3d at 758–60, Crowson, 983 F.3d at 1180.

To summarize, doing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories.  See Mata, 427 F.3d at 758.  However, merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability.  Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances.  See Estate of Jensen, 989 F.3d at 860; Oxendine, at 1277–79 & 1277 n.7 (rejecting government's argument that it was "dispositive [for purposes of liability] . . . that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care").  Should Defendants' view prevail, every institutional doctor or gatekeeping official could shield themselves from constitutional liability by simply prescribing any mild over-the-counter pain reliever, regardless of symptoms.  Such a literal inquiry into whether there was a complete denial of care is not the standard.  As one district court recently observed, "providing only *some* modicum of treatment

13

is not sufficient to absolve [defendants] from liability for potential deliberate indifference to [plaintiff's] serious medical concerns." Plunkett v. Armor Corr. Health Servs., Inc., No. 18-cv-125, 2022 WL 889962 at *6 (N.D. Okla. Mar. 25, 2022) (emphasis in original).

### 2. Obvious risk

Next, the parties contest the meaning of "obvious" risk. When a risk is obvious, it is circumstantial evidence of an official's awareness of serious medical need. Self, 439 F.3d at 1231–32. Contrary to Defendants' argument, a medical condition is not required to be obvious to a layman to state a claim. See Aplee. Br. at 23. Defendants erroneously rely on portions of Mata and Oxendine discussing obviousness to a layman under the objective, not subjective, deliberate indifference component. Id. at 23, 25. On the subjective component, Self holds that "obviousness in the circumstances of a missed diagnosis or delayed referral [is] not subject to a precise formulation." 439 F.3d at 1232. In fact, obviousness to a layman is merely one of several contexts in which deliberate indifference can be shown. Circumstantial evidence of obviousness in a missed diagnosis or delayed referral appears in contexts including (1) recognition of inability to treat and still declining or unnecessarily delaying referral; (2) condition is so obvious a layman would recognize it; or (3) complete denial of care in the face of a medical emergency. Id.

Moreover, under the subjective component of the deliberate indifference analysis, a licensed medical professional's heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial

14

risk; especially so when the injuries, like here, are internal and impossible for a layman to surmise.  Plunkett, 2022 WL 889962 at *5.  This court's caselaw has implied as much given that many cases applying the reasonable person standard did so in the context of non-medical professionals.  See Estate of Jensen, 989 F.3d at 852, 859 (applying reasonable person standard to licensed jail nurse without an ability to diagnose or prescribe medication); Quintana, 973 F.3d at 1029–31 (applying reasonable person standard to police officers and one jail nurse); Paugh, 47 F.4th at 1154–58 (applying reasonable person standard to jail officials, none of whom were medical professionals).

### C.  Application: Whether Plaintiff Plausibly Alleged Deliberate Indifference Against Dr. Myers

Since the complaint pleads both theories of deliberate indifference, we examine whether it plausibly supports a claim for deliberate indifference under a failure to treat theory and a gatekeeper theory.

#### 1.  Failure to treat theory

Plaintiff argues that Dr. Myers ignored and downplayed serious medical symptoms of which he was aware, as well as failed to order necessary additional treatment and abate Ms. Caddell's pain in the face of her consistent and severe pain. Aplt. Br. at 21–25.  Defendants argue that Dr. Myers consistently saw Ms. Caddell, assessed her condition, and treated her pain with Tylenol and ibuprofen.  Aplee. Br. at 22.  The district court relied on the "litany of treatment" provided by Turn Key staff to find that the complaint failed to state a claim against Dr. Myers on the failure

15

to treat theory.  II Aplt. App. 375.

First, contrary to the district court's analysis, it is only Dr. Myers's conduct that is relevant to his liability, not other staff's actions.  See Mata, 427 F.3d at 756. Second, as discussed, providing some modicum of treatment does not per se insulate Dr. Myers as the district court seemingly implied.

With that in mind, we must assess whether the complaint plausibly suggests Dr. Myers consciously disregarded a substantial risk, whether it merely demonstrates non-actionable medical malpractice, or whether it shows mere disagreement over a course of treatment.  The complaint alleges that by August 15, Dr. Myers was aware that Ms. Caddell (1) had been diagnosed with chlamydia; (2) had been suffering hip and groin pain for weeks; (3) had been complaining of ongoing and abnormal vaginal discharge and bleeding for weeks; (4) had mild leukocytosis; (5) had heavy E. Coli growth; and (6) that her symptoms were getting more severe, not less.  I Aplt. App. 16–17.  Of particular significance, the complaint alleges that in response to Ms. Caddell's blood work, which revealed leukocytosis, Dr. Myers "noted only that the lab results were normal, and that no follow-up was needed."  Id. 22.  The complaint also alleges that in response to a vaginal culture, which showed Ms. Caddell had heavy E. coli growth, Ms. Caddell "was merely given Tylenol" and "not sent for further evaluation and diagnostic testing."  Id. 17.

After yet more complaints of vaginal bleeding, vaginal discharge, abdominal pain, and Ms. Caddell's insistence that she was in extremis, on August 27, Dr. Myers simply noted that Ms. Caddell's claims did not fulfill medical logic.  Next, even as

16

her symptoms grew worse, the only action Dr. Myers took was to deny Ms. Caddell more ibuprofen on September 3 and accuse her of abusing the sick call system. Id. 17. After his accusation, Dr. Myers did not see or take any other actions with respect to Ms. Caddell even though she was exhibiting serious symptoms indicating substantial risk to her health.

In addition to Oxendine, this case resembles Smith v. Allbaugh, 987 F.3d 905 (10th Cir. 2021), where we held that medical staff did not "merely misdiagnose[]" when the plaintiff "presented with severe symptoms" of abdominal pain, but rather that "medical staff prescribed woefully inadequate treatment in the form of Pepto-Bismol, a laxative, Ibuprofen, and fibrous foods." Id. at 911. Here, Ms. Caddell presented with Leukocytosis, E. coli, and ongoing vaginal discharge and bleeding. Treatment with Tylenol was woefully inadequate.

Defendants argue Dr. Myers' conduct — ordering a blood test on August 5 and providing mild over-the-counter pain relievers sometime after August 15 — reflects medical judgment and at most constitutes medical malpractice. Aplee. Br. at 22–23; see Estelle, 429 U.S. at 107. However, neither the presence of some initial care prior to the evinced deliberate indifference, see Mata, 427 F.3d at 756, nor the provision of some modicum of care defeats a claim for deliberate indifference under a failure to properly treat theory. See supra Part B.1. Unlike Self where a doctor misdiagnosed but treated symptoms consistent with multiple diagnoses over about two weeks, here Dr. Myers dismissed Ms. Caddell's blood results and all the other concerning symptoms he was aware of by August 15 and did nothing else beyond possibly

providing Tylenol. Next, as of September 3, Dr. Myers had refused Ms. Caddell additional pain medication, viewed her symptoms as without medical logic, and never followed up afterwards.

Defendants make much of the fact that since detection and diagnosis of cervical cancer can in no way be obvious to a layman, the complaint fails to show Dr. Myers knew of a substantial risk.[3] Aplee. Br. at 23–26. Defendants argue Ms. Caddell's symptoms were consistent with more common and less severe conditions such as a urinary tract infection (UTI) or bacterial vaginosis. Id. at 23, 25. Defendants add that Dr. Myers always took Ms. Caddell's complaints "seriously." Id. at 26. First, as discussed, "obvious to a layman" is not a prerequisite to establish the subjective component. See supra Part B.2. Second, the complaint need not show Dr. Myers was consciously aware she had a specific ailment — cervical cancer — but rather that he was aware she faced a substantial risk of harm to her health and safety. See Farmer, 511 U.S. at 842. Third, as discussed, Ms. Caddell's worsening symptoms in conjunction with their severity and prolonged nature sharply undercut Defendants' obviousness arguments. Presented with this information, the complaint plausibly suggests that Dr. Myers knew Ms. Caddell faced a substantial and obvious risk to her health or at the very least that Dr. Myers "declined to confirm inferences of risk that he strongly suspected to exist." Farmer, 511 U.S. at 843 n.8.

And lastly, the complaint does not support any inference that Dr. Myers

---

[3] This argument applies with equal force to the gatekeeper theory of liability discussed below.

thought Ms. Caddell was suffering from a UTI or bacterial vaginosis and treated her accordingly. To the contrary, at the pleading stage, it paints a picture that Dr. Myers did not take Ms. Caddell's sick calls seriously, as he instead questioned her motives and completely denied further treatment as of September 3; a time where Ms. Caddell's situation had grown so perilous that Nurse Suzanne, acting on the same information (albeit on September 15), immediately referred her to an obstetrician.

Thus, this does not reflect "mere disagreement between the parties" concerning a course of treatment, as seeing Dr. Myers several times does not mean constitutionally adequate treatment was provided. See Oxendine, 241 F.3d at 1277 n.7. In fact, according to the complaint, Dr. Myers was clearly aware of all Ms. Caddell's worsening symptoms as he was deeply involved in her case and met with her several times. Yet rather than take reasonable steps to abate her risk, he inexplicably dismissed her entirely. Moreover, not only does Dr. Myers' heightened training provide circumstantial evidence of his knowledge and disregard of the substantial risk Ms. Caddell faced, but also, as Self stated, a jury may infer conscious disregard "[i]f a prison doctor, for example, responds to an obvious risk with treatment that is patently unreasonable." 439 F.3d at 1232. Of course, Self also held that "where a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law." Id. at 1232–33. However, such a scenario is not alleged here.

As discussed, treatment with Tylenol and accusing Ms. Caddell of fabrication

was not only woefully inadequate but also plainly inconsistent with the symptoms presented. More to the point, Dr. Myers entirely failed to monitor her afterwards to determine if his treatment plan, if it can even be described as such, was working. Thus, Dr. Myers is not insulated from liability by providing some initial modicum of care and then proceeding to otherwise ignore all of Ms. Caddell's serious medical symptoms.

As we said in Oxendine, this case may look different once Dr. Myers is "given an opportunity to clarify and explain [his] actions." 241 F.3d at 1279. "But we are tasked with deciding only whether [Lucas] has alleged sufficient facts to support a claim." Id.

### 2. Gatekeeper Theory

A closer question is whether the complaint also plausibly alleges that Dr. Myers could be liable under a gatekeeper theory. Defendants argue on appeal that Dr. Myers is not liable as a gatekeeper because he was unaware that he could not treat her or that she was suffering from cervical cancer. Aplee. Br. at 24. Moreover, Defendants argue that "[w]hen Ms. Caddell's need to see an obstetrician became clear, she was referred to an obstetrician, and when [her] need for outside medical treatment became clear, she was transferred to a hospital." Id. at 26.

First, Defendants fail to note that Dr. Myers did not refer her to the obstetrician (it was Nurse Suzanne) and did not ultimately transfer her to the hospital on October 30 (it was unnamed jail medical staff in response to Ms. Caddell's concerning symptoms of discharging tissue from her vagina and bleeding through a

20

pad every 20 minutes). I Aplt. App. 18–19. The fact that she was later referred for treatment by others does not erase Dr. Myers' failure to act at the time it was obvious Ms. Caddell faced a substantial risk. See Mata, 427 F.3d at 756 (discussing that deliberate indifference is determined "*at the time*" a medical professional refuses to treat an individual and that events subsequent to that denial have no bearing whatsoever on that analysis).

Second, Defendants' obviousness arguments fail for the same reasons discussed above. Simply put, by September 3, Dr. Myers was aware of Ms. Caddell's ongoing, serious symptoms of excessive vaginal bleeding, discharge, and pain. Further, the obviousness of the need to refer her to a specialist can be inferred by the fact that Nurse Suzanne, acting on the same information available to Dr. Myers, immediately referred Ms. Caddell to an obstetrician when she met with her on September 15. I Aplt. App. 18. The fact that Ms. Caddell's symptoms were worsening even though Dr. Myers had possibly provided Tylenol further suggests that it was obvious Ms. Caddell needed to be referred to a specialist medical personnel capable of evaluating her needs. Crucially, Dr. Myers does not appear to be an obstetrician capable of treating serious gynecological issues.

Thus, viewed holistically, the complaint plausibly suggests that by September 3, Dr. Myers had a duty in this potential emergent situation to act as a gatekeeper and refer her to medical personnel capable of treating her condition. Sealock, 218 F.3d at 1211.

However, as alleged in the complaint, Dr. Myers breached this duty when he

21

provided the functional equivalent of a complete denial of care and (1) accused her of abusing the sick call system; (2) denied her further pain medication or treatment; and (3) failed to seek any outside assistance for Ms. Caddell or otherwise refer her. See Self, 439 F.3d at 1232 (holding one can infer conscious disregard if a prison doctor responds unreasonably to obvious risk). In other words, according to the complaint, he did nothing.

In some circumstances there may be a clear difference between a "provider" and a "gatekeeper." Mata, 427 F.3d at 757. But as was the case here with Dr. Myers, a physician's role often involves treating the patient while simultaneously considering the need for referral to someone with more specialized training at the same time.[4] This is consistent with Oxendine. There we held the alleged facts supported an inference that Dr. Kaplan knew about and disregarded a substantial risk due to his treatment — the "ineffectiveness of [his] reattachment and subsequent care of the severed finger," and his gatekeeping — "the delay in seeking specialized treatment." 241 F.3d at 1278. There, the doctor was clearly not acting solely as a gatekeeper.[5]

---

[4] To be clear, we find the complaint plausibly states Dr. Myers is liable under both theories for failure to treat and for failing to refer as a gatekeeper. These theories are not mutually exclusive given the facts of this case.

[5] Sealock may have inadvertently implied that medical professionals cannot simultaneously be providers and gatekeepers. 218 F.3d at 1211 ("[i]f, however, a medical professional knows that his role in a particular emergency is solely to serve as a gatekeeper . . . he may be held liable for deliberate indifference from denying access to medical care."). However, Oxendine, which post-dates Sealock clarified, as discussed, that a medical professional, such as Dr. Myers, can occupy both positions of gatekeeper and provider simultaneously notwithstanding Sealock's use of the word

Thus, we reverse the district court's grant of the motion to dismiss the deliberate indifference claim against Dr. Myers.  Dr. Myers' alleged failure to treat and his alleged failure to refer showed conscious disregard of a substantial risk to Ms. Caddell's health.  Of course, evidence produced in discovery may reveal contrary evidence.  However, a definitive resolution is not the issue before us.

### D.  Municipal Liability for Turn Key and Sheriff Regalado

The district court determined that Turn Key and Sheriff Regalado were not liable under a municipal liability theory because Dr. Myers was not deliberately indifferent.  Hence, there was no underlying constitutional violation.

Under Monell, a plaintiff may sue local governing bodies directly for constitutional violations pursuant to the body's policies.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  Further, Monell has been extended to "private entities acting under color of state law," such as medical contractors.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003); see also Carr v. El Paso Cnty, Colo., 757 F. App'x 651, 655 (10th Cir. 2018) (unpublished).[6]  On appeal, Plaintiff advances two theories of constitutional violations suggesting municipal liability: (1) Dr. Myers' actions alone; and (2) his conduct in conjunction with other jail medical staff, including Ms. Hadden, which resulted from "systemic and deliberate indifferent [sic] policy failures."  Aplt. Br. at 27.  Given this court finds the complaint plausibly

---

"solely".  Whether either theory or both applies to a medical professional is a case-by-case factually specific determination.

[6] Turn Key does not dispute that it may be held liable under Monell.  Aplee Br. at 32.

alleges a constitutional violation in the form of Dr. Myers's deliberate indifference, the question remains if there was a possible alternate basis for municipal liability in the form of an alleged systemic failure.[7]

In the Tenth Circuit, while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures. Crowson, 983 F.3d at 1191–92; see also Garcia v. Salt Lake Cnty., 768 F.2d 303, 306–07 (10th Cir. 1985). Here, Plaintiff argues that Turn Key and Sheriff Regalado's cost-cutting policies of under-prescribing and under-administering medication, as well as, delaying transferring inmates to off site care is plausibly related to the Ms. Caddell's deficient medical care. Aplt. Br. at 29–30.

While it was error for the district court to not consider a systemic failure as the underlying constitutional violation,[8] dismissal of the municipal liability claims was

---

[7] Defendants argue that (1) systemic injury as a basis of Monell liability was not raised in either the complaint or Plaintiff's district court briefing; and (2) Plaintiff only now relies on Crowson, and as such this claim should be reviewed for plain error because the argument was forfeited. Aplee. Br. at 29–31. Defendants' argument misses the mark as Plaintiff did allege a separate systemic injury claim. While Plaintiff does not refer to Crowson by name in the complaint or district court briefing, the mention of systemic deficiencies in the complaint, various examples, and her responses to the motions to dismiss raise a systemic injury argument. See, e.g., I Aplt. App. 23, 260–61. Thus, we review this claim de novo.

[8] Determining whether the systemic failure is itself a constitutional violation that may underlie Monell liability is conflated with the Monell second step causation analysis, that is, whether the systemic policy failure caused Ms. Caddell's constitutional injury. This is the case because the Plaintiff in her briefing argues the same policy of cost cutting not only forms the basis of her underlying constitutional violation, but is also the very same policy that underlies her Monell liability claim based on the actions of Sheriff Regalado and Turn Key. See Aplt. Br. at 27–31; Aplt. Reply Br. at 20. Moreover, she cites to the same allegations in her complaint to support both arguments.

still appropriate.  The complaint founders both on the presence of a custom or policy

and causation.  It does not allege sufficient facts to demonstrate that any policy or

custom was causally connected to a constitutional violation by Dr. Myers or a

systemic violation carried out by multiple actors.[9]

To state a claim against a municipal entity, a plaintiff must allege facts

showing (1) an official policy or custom, (2) causation, and (3) deliberate

indifference.  Crowson, 983 F.3d at 1184.  Any of the following constitute an official

policy:

> (1) a formal regulation or policy statement; (2) an informal
> custom amounting to a widespread practice that, although not
> authorized by written law or express municipal policy, is so permanent
> and well settled as to constitute a custom or usage with the force of law;
> (3) the decisions of employees with final policymaking authority; (4)
> the ratification by such final policymakers of the decisions—and the
> basis for them—of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or (5) the failure to
> adequately train or supervise employees, so long as that failure results
> from deliberate indifference to the injuries that may be caused.

Id. (quoting Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1283 (10th Cir.

2019)).  Plaintiff claims that Turn Key and Regalado enacted policies and customs

designed to keep jail costs low and profit margins high.  I Aplt. App. 27.  This had

the natural consequence of both keeping inmates, even those with serious medical

---

[9] While the district court did not dismiss these claims on this basis, we can
affirm the dismissal of the municipal liability claim on alternative grounds that are
present in the record and have been briefed by the parties.  United States v. Chavez,
976 F.3d 1178, 1203 n.17 (10th Cir. 2020).  Those pre-requisites are met here.

25

needs, at the jail to avoid off-site medical costs and to under-prescribe and under-administer medications.  Id.; Aplt. Reply Br. at 20.  According to Plaintiff, this custom or policy was evident in the contract between Turn Key and Tulsa County.  The contract allegedly creates such improper financial incentives because it provides no mandatory minimum health expenditures, and it delineates financial responsibility for pharmaceuticals at the jail to Turn Key and the costs of inmate hospitalizations and offsite care to the county.  I Aplt. App. 27.

First, the cost-cutting policy allegations lack specific facts.  We find this court's decision in Sherman v. Klenke persuasive.  653 F. App'x 580, 593 (10th Cir. 2016) (unpublished).  There, this court found the plaintiff's allegation that a jail's medical contractor had a policy "to reduce overall expenses and maximize bonuses with each fiscal period" conclusory.  Id.  Similarly, there are simply no facts in Plaintiff's complaint from which one can infer a policy or custom of cost-cutting.  The problems of the Tulsa County Jail recounted in the complaint all occurred prior to Turn Key becoming the medical contractor.  See I Aplt. App. 23–26.  Further, the contract does not reveal an improper financial incentive to keep costs low as it simply describes the cost sharing agreement between the county and Turn Key.  To the extent it reveals a financial incentive, it is no more troublesome than any institution's general desire to maintain low costs to the extent reasonably possible.  Moreover, the complaint does not explain why the absence of a mandatory minimum expenditure in the contract is particularly problematic here and why it gives rise to an inference of a policy of cost-cutting.

Even if we consider the policy of cost-cutting as sufficiently pled, the complaint is devoid of any allegations which could lead one to plausibly infer these policies caused Ms. Caddell's injury. Here, the complaint does not allege that Dr. Myers or any medical staff, including Ms. Hadden, were motivated by cost in their actions. Instead, the complaint paints a picture that Dr. Myers acted inexplicably and on his own in the face of Ms. Caddell's concerning and worsening symptoms. Further, the complaint alleged Ms. Hadden's denial of Ms. Caddell's referral was temporary and on the basis of a need for verification, not due to cost concerns.

**E.  Equal Protection Claims against Turn Key and Sheriff Regalado**

In the complaint, Plaintiff alleges municipal liability based on an Equal Protection claim against Turn Key and Sheriff Regalado. I Aplt. App. at 34. Plaintiff's theory is that their policies caused disparate medical treatment of female detainees in the Tulsa jail, and that these policies were enacted to cut costs without serving a legitimate purpose. Aplt. Br. at 36. She argues the district court ignored her claim of disparate treatment and focused solely on her claim that Turn Key and Sheriff Regalado had a policy denying female inmates access to feminine hygiene products, which the district found to have no causal link to Ms. Caddell's injury. Id.

The Equal Protection clause is "essentially a direction that all persons similarly situated should be treated alike." A.M. ex rel. F.M. v. Holmes, 830 F.3d 1123, 1166 (10th Cir. 2016) (quoting Kitchen v. Herbert, 755 F.3d 1193, 1222 (10th Cir. 2014)). To state a claim for relief under the Equal Protection clause, a plaintiff must allege the existence of purposeful discrimination against herself, as a class of

27

one or with respect to a group, causing an adverse effect. Ashaheed v. Currington, 7 F.4th 1236, 1250 (10th Cir. 2021). Conclusory allegations without facts that refer to a particular person or persons treated differently are insufficient to state a claim. Brown v. Montoya, 662 F.3d 1152, 1173 (10th Cir. 2011). Moreover, to permit Monell liability for an alleged equal protection violation, the complaint must plausibly suggest Ms. Caddell's injuries "were the result of a[] [discriminatory policies]." Watson v. Kansas City, 857 F.2d 690, 695–96 (10th Cir. 1988); see Thiess v. City of Wheat Ridge, 823 F. App'x 682, 686 (10th Cir. 2020) (unpublished). Although it is not clear if Plaintiff brings a claim as a class of one or as a group, she has not stated a plausible claim for relief under either theory as she fails to show her injuries flow from these alleged discriminatory acts.

The only policies alleged in the complaint that relate to disparate treatment of female inmates, as opposed to general policies of failing to treat all inmates, are lack of access to feminine hygiene products and lack of appropriate treatment for vaginal infections including UTIs and human papillomavirus (HPV). These conditions contribute to cervical cancer. I Aplt. App. 22, 30. However, there are no allegations that Ms. Caddell was deprived of feminine hygiene products nor that she suffered from a UTI or HPV. Thus, this potential differential treatment has no relation to the harm Ms. Caddell suffered.

Plaintiff also does not point to any similarly situated male inmate who was treated with a different, let alone better, level of care due to cost-cutting. To the contrary, Plaintiff lists examples of male inmates who have also suffered from Turn

Key's allegedly inadequate medical treatment due to those measures.  Id. 28–29.

In her reply brief, Plaintiff adds that the complaint contains multiple paragraphs describing cervical cancer, a disease specific to women, and the importance of proper screening and early treatment.  Aplt. Reply Br. at 23–24.  Thus, she argues the jail and Turn Key provided substandard care to female inmates through cost-cutting policies that disincentivize cervical cancer screening.  Id.  These allegations are general and without facts suggesting differential treatment; they cannot defeat a motion to dismiss.  See Brown, 662 F.3d at 1173.  As such, the district court's denial of Plaintiff's equal protection claim was appropriate.

### F.  OGTCA issue

The district court applied the Oklahoma Supreme Court's decision in Barrios v. Haskell Cnty. Pub. Facilities Auth., 432 P.3d 233, 236 n.5 (Okla. 2018), to conclude that Dr. Myers was entitled to immunity as a healthcare employee under the OGTCA for Plaintiff's state law claims.  II Aplt. App. 375–77.  Plaintiff argues that the district court erroneously relied on a legal assumption untethered to any reasoned analysis in Barrios.  Aplt. Br. at 34.  Also, Plaintiff argues that at a minimum it was premature to answer this question at the motion to dismiss stage where the factual record has not been sufficiently developed.  Id.

An employee of the state or its political subdivision who operates or maintains a jail or correctional facility is exempt from state tort liability under the OGTCA.  51 Okla. Stat. Ann. § 155(25).  The OGTCA defines "employee" as including licensed medical professionals under contract with the county who provide medical care to

inmates or detainees.  Id. § 152(7)(b)(7).  The Barrios Court answered two certified questions of law related to whether the OGTCA applied to Oklahoma constitutional torts.  432 P.3d at 235.  In footnote five, the court wrote: "Generally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA . . . ."  Id. at 236 n.5.  After quoting the definition of "employee" in the OGTCA, the footnote "assumed" that Turn Key and its staff were "employees" under § 152(7)(b) for purposes of answering the certified questions.  Id. The court did not further analyze if Turn Key or its staff were employees because it was only concerned with whether Oklahoma constitutional torts are subject to the OGTCA.

Since Barrios, no Oklahoma court has further developed footnote five, let alone address whether a contracted medical provider is entitled to immunity.  E.g., Rocket Props., LLC v. Lafortune, 502 P.3d 1112, 1114–15 (Okla. 2022).  As for the federal court response, this court has not directly addressed the footnote other than to find a district court erred in exercising supplemental jurisdiction over a novel state law tort issue when it granted immunity to a healthcare contractor and its medical professional pursuant to that footnote.  Birdwell v. Glanz, 790 F. App'x 962, 963–64 (10th Cir. 2020) (unpublished).

Federal district court decisions with views on state law are not binding on this court.  Belnap v. Iasis Healthcare, 844 F.3d 1272, 1296 (10th Cir. 2017).  However, the majority of district courts that have addressed this question have been largely consistent in applying footnote five without distinguishing between the motion to

30

dismiss or summary judgment stage, finding that Barrios is persuasive and grants

immunity to private medical contractors.  E.g., Plunkett v. Armor Corr. Health

Servs., Inc., No. 18-cv-125, 2022 WL 997357, at *6 (N.D. Okla. Apr. 1, 2022)

(collecting cases).

Yet one district court denied immunity at the motion to dismiss stage, but

granted it on summary judgment.  Buchanan v. Turn Key Health Clinics, LLC, No.

CIV-18-00171 (E.D. Okla. Feb. 27, 2019) (denying motion to dismiss); Buchanan v.

Turn Key Health Clinics, LLC, No. 18-CV-00171, 2022 WL 2070493, at *8 (E.D.

Okla. June 8, 2022) (granting summary judgment), appeal filed June 23, 2022.

Further, in Graham v. Garfield County Criminal Justice Authority, another district

court held that Turn Key had failed to demonstrate it was entitled to immunity under

the OGTCA at the motion to dismiss stage.  No. CIV-17-634, at 3–4 (W.D. Okla.

Mar. 7, 2019).  There, the court explicitly reiterated what is obvious; that Barrios

"did not find that a healthcare contractor at a jail was an employee entitled to tort

immunity under the OGTCA but simply assumed the healthcare contractor was an

employee for purposes of answering the certified questions before it."  Id. at 4.

Moreover, prior to Barrios, other district courts have found it premature at the motion

to dismiss stage to determine whether a healthcare contractor and its medical

professional employees fall within § 152(7)(b)(7) such that they are immune.  See

Revilla v. Glanz, 8 F. Supp. 3d 1336, 1345 (N.D. Okla. 2014).

We find Revilla, Buchanan, and Graham persuasive.  On a motion to dismiss,

it was premature for the district court to determine that Turn Key and Dr. Myers were

31

entitled to immunity based on <u>Barrios's</u> non-binding legal assumption, which was decidedly not an express statement of law.  <u>Colo. Visionary Acad. v. Medtronic Inc.</u>, 397 F.3d 867, 871 (10th Cir. 2005) (using only the "holdings and considered dicta of the State Courts" to divine how a state Supreme Court would rule on a particular issue (quoting <u>Hardy Salt Co. v. Southern Pac. Trans. Co.</u>, 501 F.2d 1156, 1163 (10th Cir. 1974))).  The proper route in this instance without further guidance from Oklahoma courts is to determine the OGTCA's applicability to private corporations — and their employees — that contract with the state to provide medical services at the summary judgment stage if the factual record is sufficiently developed and the facts are uncontroverted.  Accordingly, we reverse as premature the district court's decision that Turn Key and Dr. Myers are immune under the OGTCA.

## Conclusion

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

32